Eric Nielson #5327
Laura Nielson #15008
G. ERIC NIELSON & ASSOCIATES
4790 S. Holladay Blvd.
Holladay, Utah 84117
Phone: (801) 424-9088
Fax:    (801) 438-0199
ericnielson@ericnielson.com
lauranielson@ericnielson.com

*Attorneys for Plaintiffs*

---

## UNITED STATES DISTRICT COURT,
## DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| MARK C., AMY C., and B.C., <br><br> Plaintiffs, <br><br> vs. <br><br> CHANGE HEALTHCARE, and CHANGE HEALTHCARE PREMIUM HDHP, <br><br> Defendants. | **COMPLAINT** <br><br> Case No. 2:20-cv-00916-DAK <br><br> Judge Dale A. Kimball |

**COME NOW** Mark C., Amy C., and B.C. collectively, individually and through their undersigned counsel, complain and allege against the above-captioned defendants as follows:

### PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Mark C. ("Mark") and Amy C. ("Amy") are natural persons residing in Brentwood, Tenneessee. They are covered by Change Healthcare Premium HDHP, ("the Plan") provided through Mark's employer, Change Healthcare.

2.      Plaintiff B.C. ("B.C.") is a resident of Brentwood, Tenneesee. As a beneficiary of his father's health insurance plan, he received treatment at Change Academy at Lake of the Ozarks

("Calo"), a licensed residential treatment facility in Lake Ozark, Missouri, from August 3, 2018, through July 19, 2019.

3.     The Plan is an employee benefit plan governed by the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, et. seq.

4.     This Court has jurisdiction over this matter and venue is appropriate pursuant to 29 U.S.C. §1132(e)(2) and 29 U.S.C. § 1391(c) because the appeals were written by a company located in Salt Lake City, Utah.

5.     Plaintiffs seek payment of B.C.'s denied claims from January 1, 2019, through July 19, 2019, pursuant to 29 U.S.C. §1132(a)(1)(B) and pursuant to the Mental Health Parity and Addiction Equity Act of 2008 ("the Parity Act").

6.     Plaintiffs also seek an award of prejudgment interest and attorney's fees pursuant to 29 U.S.C. §1132(g).

## FACTUAL BACKGROUND

7.     B.C. was raised by his biological mother, due to B.C.'s father not living with the family.

8.     B.C.'s father died on March 02, 2006. B.C. has clear memories of attending his biological father's funeral.

9.     B.C.'s biological mother was physically abusive. B.C. has physical scars on his back from her beatings.

10.     B.C.'s biological mother placed hot peppers on his and his brother's genitals and eyes for extended periods of time.

11.     B.C. and his older brother would spend hours or days away from home, roaming the streets in order to avoid the harsh treatment of their biological mother.

2

12.     B.C. and his older brother would be met with additional beatings upon returning home, for being gone.

13.     These events all took place before B.C. was six years old.

14.     In January 2010, at the age of seven, B.C. was moved from his biological mother's care to an orphanage. B.C. was away from his biological mothers abuse, but experienced the trauma of institutionalized child care.

15.     B.C. experienced corporal punishment and withholding of food for extended periods of time at the orphanage.

16.     B.C. was adopted on November 25, 2013 at the age of 10.

17.     B.C. moved to Brentwood, Tenneesee to live with his adoptive family. B.C. became the second oldest of five children.

18.     Upon B.C. 's joining of his adoptive family, parenting proved to be a challenge. B.C.'s earliest experiences of abuse and neglect resulted in B.C. reacting from a place of fear and need for control.

19.     B.C.'s behavior resembled defiance, disrespect, and disobedience. B.C. lived in a perpetual state of "fight or flight".

20.     B.C.'s dysregulation resulted in emotional outbursts, verbal abuse, physical aggression, lying and stealing.

21.     Specific instances of B.C.'s physical confrontation, include:

   a.   March 2016, fist-fight at school resulting in three days out of-school suspension.

   b.   October 2016, physical altercation with B.C.'s parents. They attempted to restrain B.C. but he grabbed a pencil and B.C.'s mother feared being stabbed in the neck.

   c.   June 2017, verbal altercation resulting in police being called.

    d.   August 2017, fight at school football game, resulting in suspension.

    e.   October 2017, verbal and physical altercation with parents, resulting in police being called.

    f.   November 2017, physical fight with older brother and resulting in property damage to the home. Police were called and B.C. was taken to juvenile detention with a charge of unruly justice. He had two separate court appearances and a sentence of community service.

    g.   May 2018, verbally abusive and threatened to leave home. Resulting in physical altercation with B.C.'s father. The police were called and B.C. was taken to juvenile detention for 24 hours and charged with domestic assault. Court date and sentencing were pending at the time of being admitted to Calo.

       i.   Charges were formally dropped in May 2019, as a direct result of B.C.'s ongoing residential treatment.

22.    B.C. entered puberty around the age of 13-14. B.C. developed into a physically strong young man. His parents were no longer able to restrain B.C. physically.

23.    B.C. began to use his size to his advantage by pushing authority figures and refusing to adhere to requests.

24.    B.C.'s adoptive parents began seeking the help of numerous professionals during this time period.

25.    Each of these professionals were trained specifically to work with adopted children and adoption-related issues.

26.    CBT, the primary mode of intervention, proved to be ineffective in helping B.C. heal from past trauma.

27.    B.C. was under the care of psychiatrist, David Burns, M.D., from December 2017, to June 2018. In addition to therapeutic interventions.

28.    B.C. was diagnosed with ADHD and was prescribed Adderall.

29.    Dr. Eboni states in a letter of medical necessity that "B.C. needs intensive trauma

and attachment work, the family unit is exhausted, and the community based programs are not conducive for the level of care that he needs at this time". The local law enforcement and Department of Child Services ("DCS") recommend residential treatment.

30.     Based on the unanimous opinion of B.C.'s treating providers, as well as the recommendation of the local police department and DCS, B.C's parents sought a treatment center that would address his developmental trauma stemming from his early childhood abuse.

31.     B.C.'s home environment was no longer safe, it became medically and critically necessary to admit B.C. to a residential treatment program that specializes in helping teens heal from adoption-related developmental trauma.

32.     On August 3, 2019, B.C. was admitted to Calo Residential Treatment, with transportation assistance provided by Right Direction Crisis Intervention ('RDCI'), due to B.C.'s history of non-compliance, physical aggression, and threats of running away.

33.     While at Calo, B.C. participated in two specific neurotherapy techniques, Z- score training and brainspotting. Brainspotting is an evidence-based technique that is particularly effective with trauma-based situations, helping to identify and heal underlying trauma that contributes to anxiety, depression, and other behavioral conditions.

**Pre-Litigation Appeal of the Plan's Denial of Coverage for Claire's Care**

34.     On January 4, 2019, the Plan sent the C. Family a denial of services letter stating B.C.'s treatment was not medically necessary.

35.     On April 24, 2019, the Plan sent the C. Family an EOB denial letter for B.C.'s treatment from January 1, 2019, to January 2, 2019.

36.     On May 7, 2019, the Plan sent the C. Family a second denial letter for B.C.'s treatments from January 5, 2019 to February 28, 2019, stating the treatment wasn't medically

necessary.

37.     On May 8, 2019, the Plan sent the C. Family an EOB denial letter for B.C.'s treatment from January 3, 2019, to January 15, 2019, and February 1, 2019, to February 15, 2019.

38.     On June 19, 2019, the Plan, sent the C. Family a denial letter for the service dates of services March 1, 2019, to March 15, 2019 , stating the Plan had requested additional information and the information was not received or was received incomplete.

39.     On June 21, 2019, the Plan sent the C. Family a denial letter for the service dates of March 16, 2019, to March 31, 2019, stating that the Plan had requested additional information and the information was not received or was received incomplete.

40.     On August 24, 2019, the Plan sent the C. Family a denial letter for the service dates of May 3, 2019, to May 15, 2019, stating that the Plan had requested additional information from Calo and the information was not received or was received incomplete.

41.     On September 2, 2019, the Plan sent an EOB to the C. Family, which denied B.C.'s treatment from June 1, 2019, to June 15, 2019, under the procedure code, "AJN", which states, "we have been unable to determine the benefits available for this claim because a response to our request for information from the provider has not been received."

42.     On October 11, 2019, B.C.'s parents, submitted a Level One Appeal.

43.     On December 30, 2019, the Plan responded to the Level One Appeal upholding the denial.

44.     On January 20, 2020, Mark contacted the Plan's Appeals and Grievances Department stateing he was "making an ERISA request to obtain a copy of all utilization review notes, physician's opinions, patient event notes and all other pertinent internal activities

including the clinical criteria used pertaining to these claim matters."

45.     On March 19, 2020, the C. Family submitted a an Independent Review Organization ("IRO") request regarding the December 30, 2019 denial letter from the Plan for the services rendered at Calo from January 1, 2019, through July 19, 2019.

46.     On April 30, 2020, the Plan sent a confirmation letter of the IRO request.

47.     On April 30, 2020, Advanced Medical Reviews ("AMR") sent a letter to the C. Family informing them that AMR is the IRO selected to review the case.

48.     On May 22, 2020, AMR sent a letter stating:

a.  "A physician reviewer, board certified in Psychiatry, Psychiatry Child & Adolescent, Sleep Medicine, Psychiatry with Expertise in Eating Disorders has reviewed the case regarding the aforementioned plan member."

b.  "After careful consideration of all relevant medical information, attending health care professional's recommendation, appropriate practice guidelines, applicable criteria sets, standards and interpretive guidelines, and the terms of the plan, AMR upholds the carriers decision and the request is denied."

c.  "The patient was not reported to have any suicidal or homicidal ideations or deemed to be at risk of harm to self or others. He was not reported to have any symptoms suggestive of psychosis including hallucinations, delusions, or paranoid. There was no indication that the patient had any significant symptoms suggestive of mania or hypomania."

## CAUSE OF ACTION

(Claim for Benefits Under 29 U.S.C. §1132(a)(1)(B))

49.     ERISA imposes higher-than-marketplace standards on the Plan and other ERISA fiduciaries. It sets forth a special standard of care upon a plan fiduciary, namely that the administrator discharges all plan duties solely in the interest of the participants and beneficiaries of the plan and for the exclusive purpose of providing them benefits.  29 U.S.C. §1104(a)(1).

50.     ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that plan administrators provide a "full and fair review" of claim denials.  29 U.S.C. §1104(a)(1)(D) and §1133(2).

51.     In addition, ERISA's underlying claims procedures provide clear guidelines for appropriate review of a denied claim including, but not limited to the requirement that individuals who provide reviews based on medical opinions have credentials and expertise equivalent to the claimant's treating physician(s) )C.F.R. §2560.503-1(h)(3)(iii).

52.     The Plan's actions or failures to act constitute a breach of its fiduciary duties to the C. Family under 29 U.S.C. §1104 and §1133 in the following ways: 1) by failing to set forth the specific reasons for B.C.'s claim denial, written in a manner calculated to be understood by the C. Family;  2) by failing see that B.C. was a threat to himself and others 3) by failing to provide a "full and fair review," as anticipated in ERISA's claims processing regulations, of the denial of the B.C.'s claim.

53.     Congress enacted the Parity Act as an amendment to ERISA, making it enforceable through a cause of action under 29 U.S.C. § 1132(a)(3) as a violation of a "provision of this subchapter." *A.F. ex rel. Legaard v. Providence Health Plan,* 35 F.Supp.3d 1298, 1304 (D.Or.2014); *see also* 29 U.S.C. § 1132(a)(3)(A)-(B).

54.     The Parity Act requires that if a group health plan provides both medical and surgical benefits as well as mental health or substance use disorder benefits, then it may not apply any "treatment limitation to mental health or substance use disorder benefits in any classification that is more restrictive than the predominant ... treatment limitation of that type applied to substantially all medical/surgical benefits in the same classification." 29 C.F.R. § 2590.712(c)(2)(i) (amended Jan. 13, 2014); *see also* IFRs Under the Parity Act, 75 Fed. Reg. at 5413.

55.     The Parity Act also requires that if a plan "provides mental health or substance use disorder benefits in any classification of benefits..., mental health or substance use disorder benefits must be provided in every classification in which medical/surgical benefits are provided." 29 C.F.R. § 2590.712(c)(2)(ii).

56.     The Plan violated the Parity Act by denying provides services that are less intensive than acute hospitalization and more intensive than outpatient therapy.

57.     The actions of The Plan in failing to provide coverage for B.C. treatment violate the terms of the Plan, ERISA and its underlying regulations, and the Parity Act.

58.     The actions of The Plan has caused damage to the C. Family in the form of denial of payment of B.C.'s treatment.

59.     The Plan is responsible to pay for B.C.'s treatment claim along with pre-judgment interest and attorney's fees and costs pursuant to 29 U.S.C. §1132 (g).

## RELIEF

WHEREFORE, Plaintiffs seeks relief as follows:

60.     Judgment in the amount of B.C.'s past due treatment claims from January 1, 2019, through July 19, 2019.

61.     Pre-and post-judgment interest on the past due benefits pursuant to U.C.A. §15-1-1;

62.     An award of attorney fees pursuant to 29 U.S.C. §1132(g); and

63.     For such further relief as the Court deems equitable.

RESPECTFULLY SUBMITTED this 30th day of December, 2020.

G. ERIC NIELSON & ASSOCIATES
  _/s/ Laura Nielson_____
Laura Nielson
*Attorney for Plaintiff*